IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

**CIVIL ACTION NO. 2:22-CV-101 (WOB-CJS)**

QUSSAY ALBAKRI,                                                     PLAINTIFF,

VS.                    **MEMORANDUM OPINION AND ORDER**

STS LAB 2 LLC, ET AL.,                                              DEFENDANTS.

This is an action brought by Qussay Albakri ("Albakri") against STS Lab 2 ("STS") and Amazon.com Services ("Amazon") for wrongful termination and employment discrimination. Currently before the Court is Defendants' Motion for Partial Dismissal. (Doc. 19).

The Court has carefully reviewed this matter and, being advised, now issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

Defendant Amazon and its wholly owned subsidiary, Defendant STS, hired Plaintiff Albakri as the Medical Lab Director for a COVID-19 testing lab for Amazon's employees on September 8, 2020. (Doc. 18 ¶¶ 9-10; Doc. 19 at 3). In this role, Albakri was in charge of clinical validations, quality management systems, data analysis and interpretations, and FDA submissions related to Defendants' COVID-19 testing operation. (Doc. 18 ¶ 11; Doc. 19 at 3).

Albakri alleges that, in order to meet submission deadlines for FDA approval, Amazon leadership required him to remove and replace certain samples from analyses submitted to the FDA, which is a clear violation of data presentation protocol. (Doc. 18 ¶ 13). Albakri notes that he discovered that false results were sometimes being reported to patients and that he complained about the issue, but Defendants failed to take remedial action for at least a year. (*Id.* ¶ 15). Albakri also alleges that, in July 2021, he refused to give false information to the FDA regarding Defendants' testing procedures. (*Id.* ¶ 16; Doc. 19 at 3). At some point, Defendants conducted an internal investigation into their testing process, which cleared Albakri of any wrongdoing. (Doc. 18 ¶ 19).

Albakri contends that, despite his lack of misconduct, STS and Amazon began retaliating against him by restructuring his team, removing "key players" from his direct supervision, and threatening to terminate him on multiple occasions. (*Id.* ¶¶ 20-21). Albakri also alleges that he was reassigned to a supervisor, Josh Watson ("Watson"), against whom he had previously filed complaints for national origin and race discrimination. (*Id.* ¶ 22-23; Doc. 19 at 4). Albakri, who is Palestinian, notes that Watson prevented him from hiring and promoting other employees and from implementing his "visions," but that white leaders were not similarly constrained. (Doc. 18 ¶¶ 23, 37; Doc. 19 at 4). Albakri

also alleges that he was denied a promotion due to his race and national origin. (Doc. 18 ¶ 23; Doc. 19 at 4).

In October 2021, Albakri was suspended due to alleged issues with expense reports he submitted. (Doc. 18 ¶ 26). Shortly thereafter, on October 27, 2021, Albakri was terminated. (*Id.* ¶ 27). Albakri contends that he was terminated, not because of his expense reports, but in retaliation for his prior complaints regarding FDA submissions and due to race and national origin discrimination. (*Id.*).

On July 18, 2022, Albakri filed the instant action in Boone County Circuit Court and Defendants thereafter removed it to this Court. (Doc. 1). On October 3, 2022, the Court granted Albakri's motion to file an amended complaint and dismissed Defendants' then-pending motion to dismiss as moot. (Doc. 17).

Albakri's Amended Complaint asserts claims for: (1) wrongful termination against public policy in violation of K.R.S. § 517.050; (2) discrimination and a hostile work environment due to national origin in violation of the Kentucky Civil Rights Act ("KCRA") (K.R.S § 344); (3) race discrimination in violation of the KCRA; (4) retaliation; (5) tortious interference with a business relationship against Defendant Amazon; and (6) intentional infliction of emotional distress/outrage. (Doc. 18).

Defendants have now moved to dismiss Albakri's claims for wrongful termination, hostile work environment, tortious

interference with a business relationship, and intentional infliction of emotional distress for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 19 at 1).

### *Analysis*

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a claim if it "fail[s] to state a claim upon which relief can be granted." To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *id.* at 556).

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). However, at the motion to dismiss stage, courts must construe the complaint liberally, presume all factual allegations in the complaint to be true, and make reasonable inferences in favor of the non-moving party. *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (internal citations omitted). "The moving party has the burden of proving that no claim exists." *Id.*

4

In diversity actions, federal courts apply the substantive law of the forum state. *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001) (citing *Hanover Ins. Co. v. Am. Eng'g Co.*, 33 F.3d 727, 730 (6th Cir. 1994)). Thus, Kentucky law applies to all claims in this case.

### A. Wrongful Termination

In Kentucky, "ordinarily an employer may discharge [its] at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983) (internal citations omitted). However, "[t]he Supreme Court of Kentucky has recognized a narrowly defined exception to this 'terminable-at-will' doctrine for wrongful discharge in violation of public policy." *Childers v. Prod. Action Int'l, Inc.*, 146 F. App'x 6, 8 (6th Cir. 2005). "To fall within the public policy exception to the 'terminable at will' doctrine, an employee must prove: 1) that the discharge was contrary to a fundamental and well-defined public policy as evidenced by existing law; and 2) the policy must be evidenced by a constitutional or statutory provision." *Id.* (citing *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985)).

The Kentucky Supreme Court held that

> only two situations exist where grounds for discharging an employee are so contrary to public policy as to be

5

> actionable . . . : '[f]irst, where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment. Second, when the reason for a discharge was the employee's exercise of a right conferred by well-established legislative enactment.'

*Hall v. Consol of Ky., Inc.*, 162 F. App'x 587, 589 (6th Cir. 2006) (quoting *Grzyb*, 700 S.W.2d at 402).

Here, Albakri alleges that, in July 2021, three months before his termination, he refused to give false information to the FDA. (Doc. 18 ¶ 16). He also alleges that he was terminated in retaliation for his complaints about Defendants' "pattern of ongoing falsification of business records" in violation of K.R.S. § 517.050. (*Id.* ¶¶ 32, 34).

As to the second prong of the *Grzyb* test, Defendants correctly argue that, under Kentucky law, reporting "illegal activity to those other than public authorities is not protected activity under the public policy exception." *See Zumot v. Data Mgmt. Co.*, No. 2002-CA-002454-MR, 2004 WL 405888, at *1 (Ky. Ct. App. Mar. 5, 2004). Although Albakri alleges that he complained about falsified business records to Defendants' management, (*see* Doc. 18 ¶ 33), such internal complaints do not constitute the exercise of a right protected by statute. Albakri also argues that he is not currently in possession of any documentation of communication between himself and the FDA and that only after discovery would he be able to provide evidence as to whether he also complained to the FDA,

6

which would constitute statutorily protected activity. (*See* Doc. 20 at 3-4). However, because the Amended Complaint contains no allegations that Albakri reported any illegal activity to the FDA or another public authority, this argument fails.

However, setting aside Albakri's argument under the second prong, he has also alleged that he refused to violate K.R.S. § 517.050 when asked to report false information to the FDA, which falls within the first prong of *Gryzb*. (*See* Doc. 18 ¶ 16). Although Defendants note that Albakri did not specifically argue that he was terminated for this alleged refusal, (*see* Doc. 19 at 7), the fact that he was terminated three months later allows the Court to draw a reasonable inference that the termination may have been based on the refusal. Albakri did allege that he was terminated because of his complaints regarding falsified business records, (*see* Doc. 18 ¶ 34), and the Court may also reasonably infer that one such "complaint" involved the incident in which he refused to provide false information to the FDA.

Defendants contend that Albakri has only provided a formulaic recitation of his refusal to violate a law, (*see* Doc. 19 at 6-7), but that argument is not well taken, as Albakri provided details about his alleged refusal, including what process was at issue, why the information would have been false, how the falsified information would have benefitted Defendants, and the month and

7

year in which Defendants allegedly asked Albakri to submit the information to the FDA. (Doc. 18 ¶ 16).

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's claim for wrongful termination in violation of public policy, as Plaintiff has stated a claim with facial plausibility.

### B. Hostile Work Environment

To establish a prima facie case of hostile work environment,[1] a plaintiff must establish: (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment based on race or national origin; (3) the harassment had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there is a basis for liability on the part of the employer. *Owhor v. St. John Health-Providence Hosp.*, 503 F. App'x 307, 312 (6th Cir. 2012) (citing *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009)). "The third element requires a plaintiff to show that the workplace was permeated with harassment that was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

---

[1] Although Albakri does not assert federal claims in his Amended Complaint, "[b]ecause [KRS] Chapter 344 mirrors Title VII of the Civil Rights Act of 1964 . . . , we use the federal standards for evaluating race discrimination claims." See *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000) (citing *Ky. Comm'n on Hum. Rts. v. Ky.*, 586 S.W.2d 270, 271 (Ky. Ct. App. 1979)).

environment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Here, Defendants only argue that Albakri has failed to sufficiently allege that he was subjected to unwelcome harassment that was intimidating, hostile, or offensive.[2] (Doc. 19 at 9). The Supreme Court has held that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances . . . includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. While all relevant factors "may be taken into account, no single factor is required." *Id.*

Albakri has alleged that his supervisor, Watson, "engaged in a pattern of discriminatory and exclusionary behavior against foreigners." (Doc. 18 ¶ 23). He also cited specific examples of how Watson's alleged discrimination interfered with his work performance, as he was prevented from hiring and promoting other employees and implementing his visions, which Albakri notes were "essential functions of his job." (*Id.*; Doc. 20 at 5). Albakri also points out that he was embarrassed and emotionally distressed because of Watson's conduct. (Doc. 18 ¶¶ 40, 45; Doc. 20 at 5).

---

[2] Defendants have not moved to dismiss Plaintiff's claims of discrimination based on race or national origin. (Doc. 19 at 10 n.6).

Although Defendants correctly note that Albakri did not specifically allege that he was subjected to "discriminatory intimidation, ridicule, and insult," (Doc. 19 at 9–10), such allegations are not required under *Harris* in light of Albakri's other allegations.

Because Albakri has alleged several facts that would allow a reasonable inference that Defendants created a hostile, abusive, and offensive work environment such that the conditions of his employment were altered, the Court finds that Albakri has stated a facially plausible claim for hostile work environment based on national origin and race discrimination.

### C. Tortious Interference with a Business Relationship

Defendants also argue that Albakri has failed to state a claim for tortious interference with a business relationship against Amazon because there is no dispute that STS is a wholly owned subsidiary of Amazon. (*Id.* at 10; Doc. 18 ¶ 10). Under Kentucky law, "a parent corporation has a privilege to interfere in the contractual relations of its wholly-owned subsidiary, unless it employs wrongful means or acts contrary to its subsidiary's interests." *Sparkman v. Consol Energy, Inc.*, 571 S.W.3d 569, 572 (Ky. 2019) (footnote omitted). "Wrongful means is defined to include acts which are wrongful in and of themselves, such as misrepresentations of facts . . . or any other wrongful act

10

recognized by statute or common law." *Id.* (internal quotations omitted).

Here, Albakri has alleged that Amazon interfered with his business relationship with STS by "misrepresent[ing] Plaintiff's expense reimbursement agreement . . . ." (Doc. 18 ¶ 52). Although Defendants argue that Albakri failed to articulate the circumstances of Amazon's alleged misrepresentation or how such a misrepresentation was wrongful, those arguments are not well taken. (*See* Doc. 19 at 10-11).

In fact, Albakri did allege the circumstances of the misrepresentation. Albakri's Amended Complaint states that he was "enticed" to commute from his home in Cleveland, Ohio to his work location in Kentucky by an agreement that his travel expenses would be paid and that, during the first several months of his employment, his expense reports were "consistently approved." (Doc. 18 ¶¶ 24-25). However, according to the Amended Complaint, in October 2021, he was questioned by Human Resources regarding his previously approved expense reports and ultimately suspended because of them. (*Id.* ¶ 26). As such, Albakri has plausibly alleged that Amazon misrepresented the terms of the initial expense reimbursement agreement in order to terminate his employment. Further, Albakri need not specifically allege that the misrepresentation was wrongful because the Kentucky Supreme Court has defined "misrepresentations of facts," such as those alleged

11

here, to be "acts which are wrongful in and of themselves." *See Sparkman*, 571 S.W.3d at 572.

Defendants also argue that Albakri has failed to allege that Amazon interfered with his business relationship with a third party because he has merely alleged that Amazon interfered with his relationship with its wholly owned subsidiary. (Doc. 19 at 11). However, this argument is also unpersuasive, as the Kentucky Supreme Court did not hold that a parent corporation is incapable of interfering with its wholly owned subsidiary's business relationships, but rather specifically articulated the test for when a parent corporation could be held liable for such interference in *Sparkman*. Further, Defendants have not cited a case in which any court has held that, under Kentucky law, wholly owned subsidiaries are not considered third parties in relation to their parent companies for the purposes of an interference claim.

Accordingly, the Court finds that Albakri has stated a plausible claim against Amazon for tortious interference with a business relationship.

### D. Intentional Infliction of Emotional Distress

Finally, Defendants argue that Albakri has failed to state a claim for intentional infliction of emotional distress. (Doc. 19 at 11-13). In order to recover on a claim for intentional infliction of emotional distress under Kentucky law, a plaintiff

12

must show that: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was so outrageous and intolerable that it offends generally accepted standards of decency and morality; (3) there is a causal connection between the defendant's conduct and the plaintiff's emotional distress; and (4) the plaintiff's emotional distress was severe. *Osborne v. Payne*, 31 S.W.3d 911, 913–14 (Ky. 2000).

Defendants contend that Albakri has not alleged that they engaged in any conduct that could be considered extreme or outrageous. (Doc. 19 at 12). Defendants correctly note that Kentucky courts have found that "[t]he mere termination of employment . . . do[es] not rise to the level of outrageous conduct . . . necessary to support a claim for IIED." *Miracle v. Bell Cnty. Emergency Med. Servs.*, 275 S.W.3d 555, 560 (Ky. Ct. App. 2007) (citing *Benningfield v. Pettit Env't, Inc.*, 183 S.W.3d 567, 572 (Ky. Ct. App. 2005)).

However, Albakri has alleged that Defendants did more than merely terminate him: he has alleged that they asked him to remove samples from analyses submitted to the FDA in violation of data presentation protocol; ignored his complaints that incorrect COVID test results were being reported to patients; asked him to provide falsified information to the FDA in order to retain approval; misled his entire team by informing them that he had failed to perform his job duties; asked him to be complicit in submitting

13

inaccurate and incomplete information to the FDA; threatened to terminate him on multiple occasions; and accused him of submitting fraudulent expense reports despite their prior agreement to pay those expenses. (Doc. 18 ¶¶ 13, 15-18, 21, 24-26). Accordingly, these allegations, taken as true, allow the Court to conclude that Albakri's Amended Complaint is sufficient to survive the pleading stage.

Similarly, Defendants' argument that Albakri has only provided formulaic recitations of the elements of his claim fails, because he has alleged numerous facts regarding the alleged intentional conduct of Defendants. Albakri has also alleged that, as a direct result of such conduct, he continues to suffer from severe emotional distress and mental anxiety. (*Id.* ¶ 57).

Defendants also contend that Albakri's intentional infliction of emotional distress claim is preempted by his KCRA claims. (Doc. 19 at 13). Defendants are correct in that "Kentucky courts have consistently held that where a plaintiff pursues relief under the Kentucky Civil Rights Act, a claim of IIED based on the same employer conduct is barred." *Bogle v. Luvata Franklin, Inc.*, No. 1:12-CV-00200-TBR, 2013 WL 1310753, at *2 (W.D. Ky. Mar. 28, 2013) (collecting cases).

However, Albakri has alleged conduct in addition to the national origin and race discrimination that forms the bases of his KCRA claims in support of his intentional infliction of

14

emotional distress claim, as discussed above. Defendants' alleged insistence that Albakri participate in a scheme to defraud the FDA and patients or otherwise face being falsely accused of failing to perform his job duties and submitting unauthorized expense reports is unrelated to Albakri's separate allegations that his supervisor denied him opportunities and created a hostile work environment due to his race and national origin. Accordingly, the Court finds that Albakri's intentional infliction of emotional distress claim is not preempted by his KCRA claims because they are based on separate instances of conduct.

Thus, the Court denies Defendants' motion to dismiss Albakri's intentional infliction of emotional distress claim.

*Conclusion*

Therefore, for the reasons stated above, **IT IS ORDERED** that:

(1) Defendants' Motion for Partial Dismissal (Doc. 19) be, and is hereby, **DENIED;** and

(2) The parties shall confer no later than **December 19, 2022,** to consider the nature and basis of their claims and defenses and the possibilities for a prompt settlement or resolution of the case, to make or arrange for the disclosures required by Rule 26(a)(1), and to develop a proposed discovery plan. Such proposed plan shall be filed no later than **January 3, 2023.**

This 6th day of December 2022.



Signed By:
**_William O. Bertelsman_** WOB
United States District Judge